IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| SEEMA KHADIM, ET AL.,<br><br>　　　　　　　　　　　　*Plaintiffs*,<br><br>　　　　v.<br><br>LABORATORY CORPORATION<br>OF AMERICA, ET AL.,<br><br>　　　　　　　　　　　　*Defendants*. | CIVIL ACTION NO. 3:11-CV-00019<br><br><br>MEMORANDUM OPINION<br><br><br>NORMAN K. MOON<br>UNITED STATES DISTRICT JUDGE |

Plaintiffs, Ms. Seema Khadim and Mr. Sultan Zeb, are a married couple who filed a "wrongful birth" suit in the Circuit Court for the City of Charlottesville, alleging that negligence on the part of Defendants, Laboratory Corporation of America and Laboratory Corporation of America Holdings (collectively, "LabCorp"),[1] led to erroneous prenatal genetic testing results for Plaintiffs' then-unborn child.[2] Defendants removed the case here.

Currently pending are the parties' cross-motions (docket nos. 32 & 36) for partial summary judgment, and Plaintiffs' motion to strike (docket no. 39) a declaration submitted by LabCorp in support of its motion for summary judgment. The motions for partial summary

---

[1] Plaintiffs filed their complaint against "LABORATORY CORPORATION OF AMERICA t/a LABCORP" and "LABORATORY CORPORATION OF AMERICA HOLDINGS." Defendants answered the Complaint in the name of both defendants through the collective name "LabCorp." *See* Docket No. 4, Defendants' Answer ("Defendants Laboratory Corporation of America and Laboratory Corporation of America Holdings (collectively "LabCorp"), by and through its undersigned attorneys, hereby answers the Complaint."). Therefore, although it appears that, as a technical matter, there are two defendants, I will refer when convenient to the collective "LabCorp."

[2] Virginia recognizes "wrongful birth" claims arising from negligently performed tests that failed to discover that a fetus is affected by a disease, depriving the parents of the opportunity to make an informed decision regarding abortion. *See Naccash v. Burger*, 223 Va. 406 (1982).

judgment present the following questions:

> 1) Is Sultan Zeb a proper plaintiff in this "wrongful birth" action?

> 2) Is LabCorp a "health care provider" under the Virginia Medical Malpractice Act ("VMMA"), Va. Code. § 8.01-581.1 *et seq.*, thus subjecting damages in this action to the limitation provided in the VMMA?[3]

For the reasons stated herein, I find that Sultan Zeb is a proper plaintiff, and I will deny Defendant's motion, in part, on that ground.  Regarding the limitation of damages under the VMMA, I find that LabCorp is a "health care provider" under the VMMA, and the VMMA's limitation on damages does indeed apply here; accordingly, I will grant Defendant's motion, in part, on that ground, and I will deny Plaintiff's motion, which contends that LabCorp is not a "health care provider" and seeks partial summary judgment that the VMMA's cap on damages does not apply.  And, for reasons stated herein, Plaintiffs' motion to strike fails, and it will be denied.

# I.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury

---

[3] Plaintiffs have abandoned negligence- and warranty-based products liability claims, and have also abandoned a claim for punitive damages.  *See* docket no. 42, n. 2.

could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

## II.[4]

### A.

Plaintiffs decided to have a child together. Both Khadim and Zeb are unaffected carriers of the "thalassemia beta trait." The complaint describes thalassemia, in pertinent part, as follows:

> Thalassemia is the name of a group of inherited blood disorders that causes the body to make less hemoglobin, the substance in red blood cells that transports oxygen from the lungs to other parts of the body.

---

[4] Unless otherwise indicated, the facts recounted herein are generally not in dispute.

Hemoglobin consists of two different proteins, an "alpha" and a "beta." People who do not produce enough "alpha" protein have alpha thalassemia, and those who do not produce sufficient "beta" protein have beta thalassemia.

There are three different types of beta thalassemia. The mildest form is thalassemia minor, which is also known as thalassemia trait. Someone with thalassemia minor has no major symptoms and is just a carrier of the genetic trait for thalassemia. In thalassemia intermedia, the lack of beta protein in the hemoglobin is significant enough to cause a moderately severe anemia and significant related health problems.

The most severe form of beta thalassemia is thalassemia major, also known as Cooley's anemia. People afflicted with Cooley's anemia have a complete lack of beta protein in the hemoglobin. This condition causes a life-threatening anemia that requires regular blood transfusions and extensive ongoing medical care. These extensive, lifelong blood transfusions lead to iron-overload which can cause serious organ damage. Additionally, those afflicted experience excruciating pain in the aftermath of blood transfusions; female sufferers are often rendered infertile; and the lifespan of persons affected by this disease is likely shortened. They also require frequent hospitalizations and other medical interventions throughout their lives to manage the serious illness.

Plaintiffs, unaffected "carriers only" of the thalassemia beta trait, "each possess one genetic defect. People who suffer from Cooley's anemia have two genetic defects." The complaint continues:

Both Khadim and Zeb have, and have had, multiple family members affected by Cooley's anemia and have witnessed the devastating effects of the disease first hand. As a result, each was acutely aware of the consequences that Cooley's anemia would have on an affected person.

* * *

Knowing that both were carriers, Khadim and Zeb understood that there was a one-in-four chance that their baby would be affected, rather than merely a carrier.

Conducted properly, genetic testing can be performed to determine if a fetus has a single gene defect, and is thus only a carrier, or if a fetus has two gene defects, in which case the baby would be affected by the more serious forms of the disease.

After much deliberation and after seeking religious and other guidance, Khadim and Zeb made the difficult and very personal decision that, if their fetus had two defective genes and would therefore be affected by the disease, they would

-4-

terminate the pregnancy at the earliest possible stage.

Khadim became pregnant, and sought genetic counseling.  Amniocentesis was performed by Khadim's doctor "[o]n or about March 3, 2009."  The collected material was forwarded first to Genzyme, a laboratory that "did not have the capability to perform testing for thalassemia." That laboratory then "sent the material to the LabCorp Defendants to perform prenatal genetic testing for thalassemia."  LabCorp "represented that they were equipped to perform such testing quickly and accurately," and provided prenatal diagnostic testing services "[f]rom on or about March 2009 to September 2009 . . . to determine whether Plaintiffs' then unborn child was affected by Cooley's anemia."

> In this case, it appears that the "linear array"
>
> test strip that contained the genetic information belonging to the fetus appears *to have been intentionally cut* so that crucial genetic information was missing and could not be properly interpreted. . . .  At the top of the fetus' test strip, the clearly marked "reference line" does not line up with the reference guide because the part of the strip containing the reference line is missing, having been cut. . . .  It is evident that some of the genetic information is simply missing and that the array was intentionally made defective because it was cut. . . .

Ultimately, Plaintiffs were informed that their fetus was an unaffected carrier. "Notwithstanding the obvious defect and that the critical genetic information needed for an accurate diagnosis is missing from the test strip, the technician who performed the testing relied upon a test that was defective on its face and reported that the baby was a carrier," and, "[d]espite the obvious defect in the test material," the Direcotr of LabCorp's Molecular Genetics Laboratory, Dr. Kenneth Friedman, "reviewed the technician's findings and approved the technician's conclusions despite the fact that it is clearly evidence that part of the critical genetic information is absent."

Subsequently, LabCorp requested additional genetic information from both parents.

"Significantly, in this case, the parents happen to carry an identical gene defect," information that

> is critical to the testing procedure.  A technician must be particularly cautious in reading the test results because the fetus would share the same mutation as the parents and the genetic testing could appear to reflect the presence of only a single gene mutation, even if the fetus carried the two identical gene mutations inherited from the parents.

> The presence of a normal gene would have confirmed the earlier report that the baby was a carrier, not an affected person, because affected persons have two abnormal genes and a normal gene would not have been present in the fetus.

> For that reason, it was imperative that the technician examine the baby's test strip not only to identify the absence of a gene, but also the presence of a normal gene.

> However, the LabCorp Defendants never examined the fetus' test material for the presence of a normal gene, and could not have done so because that portion of the strip had been cut.

> The relevant genetic information showing the presence of a normal gene would have been captured in the very area of the test strip that had been cut.

> When the LabCorp Defendants interpreted the fetal testing for the second time, they were aware that the parents carried an identical gene defect and should have been especially vigilant to examine the fetal results not only for the defective gene that had been identified previously, but also for the normal gene that would have confirmed the diagnosis that the fetus was a carrier, not an affected person.

Nonetheless, the reported result was that the fetus was only a carrier.  Accordingly, Plaintiffs continued the pregnancy, and on August 30, 2009, Ms. Khadim gave birth to a baby girl, named Aleena.  It was soon determined that Aleena was affected with beta thalassemia, and at one month of age, underwent her first blood transfusion.  She frequently undergoes transfusions and the intravenous administration of chelation therapy (overnight through a port in her chest) to remove heavy metals from her body.  The child's life may be saved by a bone marrow transplant, which is in itself not without risk and discomfort, and must be preceded by

chemotherapy that may render the child infertile.

**B.**

Defendants' motion for partial summary judgment indicates that it is uncontroverted that Defendants returned incorrect test results, and the motion generally comports with the facts as alleged in Plaintiffs' complaint and their motion for partial summary judgment.   When conducting beta-thalassemia testing in 2009, LabCorp utilized Roche Molecular Diagnostics' Linear Array Beta Hemoglobinopathy Assay ("the Beta-Thalassemia Assay").   LabCorp purchased this test kit from Roche in approximately 2004, and thereafter LabCorp's Center for Molecular Biology and Pathology Research and Development team validated the test in-house. The test strips that constitute the assay react to form a colored band in the presence of a genetic mutation.   If the assay detects a mutation, the technologist checks for the presence of a corresponding wild type or normal band, which indicates that the patient is an unaffected carrier of the mutation.   The absence of this control band signifies that instead of inheriting the normal counterpart of that gene sequence, the patient has inherited two abnormal copies and will be affected by the disease.

Roche typically performed the test using a computer software program to read the test strips.  LabCorp states that it found the software incompatible with its needs for the assay, and therefore its technicians interpreted the test by manually reading the test strip.   During LabCorp's validation of the Beta-Thalassemia Assay, employees at Roche orally instructed the technicians in LabCorp's Research and Development department, Danny Overman and Eddie Kallam, on the manual interpretation of the test strip.  In accordance with these oral instructions received from Roche, the technicians believed that all of the mutations on the test strip would immediately follow the corresponding control band.

-7-

After he received training from Roche on how to interpret the Beta-Thalassemia Assay, Mr. Overman proceeded to provide identical instruction to the LabCorp technician assigned to perform the test in the laboratory, William McCachren, in accordance with company policy.  Mr. Overman also shared his understanding of how to perform and interpret the Assay with Dr. Friedman.

Roche designed the Beta-Thalassemia Assay to test for two separate diseases, sickle cell anemia and beta-thalassemia.  Because it is common laboratory practice not to test for a disease that the physician does not order, LabCorp originally resolved this issue by blacking out lines 1-3 of the strip, which contained the sickle cell mutations.  At some point after LabCorp began to run the test in January 2006, it modified the procedure for removing the sickle cell mutations by cutting the top portion of the strip to remove lines one, two, and three.[5]

On March 3, 2009, Ms. Khadim underwent an amniocentesis procedure, performed by her obstetrician, Dr. Barbara Head, in order to have her fetus tested for the beta-thalassemia trait.  On March 24, 2009, LabCorp received the fetal sample and Senior Laboratory Technologist William McCachren thereafter conducted testing using the Beta-Thalassemia Assay.  The test results were reviewed and released by Kenneth Friedman, Ph.D., the Director of Molecular Genetics at LabCorp's Center for Molecular Biology and Pathology in North Carolina.

On March 30, 2009, LabCorp reported that the fetus appeared to be an unaffected carrier of a beta-thalassemia mutation.  The report cautioned that, because the parents' mutations were unknown, the test was not definitive.  Thereafter, both Plaintiffs underwent testing through Quest Diagnostics, a separate company and laboratory unrelated to LabCorp, to determine their

---

[5] Thus, contrary to the instruction received allegedly from Roche, three of the eighteen control bands on the test strip do not immediately precede the corresponding mutation(s).

specific genetic mutations.  It is absolutely undisputed that LabCorp received this additional documentation and thereafter issued a "corrected" lab report on April 24, 2009, which again determined (albeit again incorrectly) that the fetus was a carrier of the mutation and unaffected by the disease.

After the birth of Plaintiffs' daughter on August 30, 2009, post-natal testing diagnosed her with beta-thalassemia.  An investigation by Dr. Friedman ensued and, following Dr. Friedman's investigation, LabCorp personnel notified Ms. Khadim and her treating physicians and offered to perform follow-up testing.

**III.**

**A.**

In the instant case, Sultan Zeb is a proper plaintiff in his own right.

As I have already observed, on March 24, 2009, LabCorp received the fetal sample.  A lab technician conducted testing for beta thalassemia, and the results were reviewed by the lab director.  LabCorp reported that the fetus appeared to be an unaffected carrier, but the report cautioned that, because the parents' mutations were unknown, the test was not definitive. Thereafter, both Ms. Khadim and Mr. Zeb underwent blood testing by Quest Diagnostics, and the results of that testing were submitted to LabCorp.  LabCorp received this additional documentation and issued a corrected report.

Seema Khadim and Sultan Zeb submitted the genetic information received from Quest Diagnostics to LabCorp upon LabCorp's direction.  The genetic counselor who coordinated the genetic testing for LabCorp, Dagny Patton, testified in her deposition that she first directed the request for the parents' genetic testing to a genetic counselor at Genzyme.  Ms. Patton testified

that she was concerned that Genzyme's genetic counselor might fail to follow up with the request, and therefore she contacted Dr. Barbara Head, and informed her that the parents needed to be tested to determine the specific trait they carried.  In response to the direction received from LabCorp through Dr. Head's office, both Ms. Khadim and Mr. Zeb immediately reported to Quest Diagnostics and were tested.  The results of both parents' tests were submitted on their behalf to LabCorp.  LabCorp does not dispute receiving the Quest reports and issuing its "Corrected Report."

There is no dispute that LabCorp knew or should have known that Mr. Zeb would rely upon LabCorp's testing.  Eric Krivcehnia, LabCorp's genetic counselor, agreed that the purpose of genetic testing, such as the one performed in this case, is so "*parents* can know in advance whether *their* child or fetus is affected" and that "generally *parents* who do the prenatal testing want those results so *they* can act on it."  (Emphasis added.)  On its Web-site, in response to the question, "Who should consider genetic counseling?" LabCorp stated:

> • Women who are pregnant or are planning to become pregnant at or above the age of 35 (advanced maternal age).[]

> • Women/*couples* who have been told their pregnancy is at an increased risk for a birth defect or genetic condition based on the results of maternal serum screening.[]

> • Women/*couples* who have been told their pregnancy is at an increased risk for a birth defect or genetic condition, such as an open neural tube defect, Down syndrome, or trisomy 18, based on ultrasound findings.

> • *Couples* who are close blood relatives, such as first cousins.

> • Women/*couples* who are pregnant or considering pregnancy who are concerned about an increased risk to the pregnancy due to medical conditions or teratogenic exposures to drugs, alcohol, radiation, chemicals, prescription or over-the-counter medications.

> • *Couples who would like to discuss testing for conditions that occur more frequently in a specific ethnic group.*

• Women/*couples* who have had two or more miscarriages or unexplained infant deaths.[]

• Individuals/*couples who have family history of an inherited condition*, mental retardation, or a birth defect.[]

• *Those interested in assessing their genetic risks.*

(Emphasis added; footnotes and hyperlink markers omitted.)[6]

LabCorp knew or should have known that their results could impact two parents, not just one. As LabCorp's Web-site marketing material shows, it actively markets its prenatal genetic testing to couples, not just expecting mothers, and LabCorp expressly acknowledges both that it solicits business from couples, not just mothers, and that it renders a service to couples, not just mothers.[7]  And, significantly, LabCorp returned its "corrected" report after evaluating a separate test performed on Mr. Zeb.

## B.

Mr. Zeb's claim against LabCorp flows from a straightforward factual predicate.  Mr. Zeb, along with his wife, wanted to know whether his unborn child would be affected by beta thalassemia, a disease especially prevalent in both their families.   LabCorp specifically undertook to answer this question, and *overtly* requested that Mr. Zeb provide it with *additional genetic material*.  Knowing full well that a man who had submitted his own genetic material for LabCorps' review might rely upon its test results in deciding with his wife whether to continue the pregnancy, LabCorp provided incorrect results.  As a result, Mr. Zeb now suffers his own,

---

[6] *See* https://www.labcorp.com/genetics/common_question/index.html; a printout of the page when it was accessed on October 10, 2011, is available at docket no. 42, attachment 11.

[7] Indeed, it was Mr. Zeb's insurance that was billed for the testing, and Mr. Zeb was an additional guarantor of the payment.

unique damages compensable under Virginia law, including watching his child suffer, knowing the relatively high possibility of her death because of the disease, and the financial burden and responsibility.  Under these facts, Virginia law is clear that Mr. Zeb has his own independent claim against Labcorp.

In 1982, the Supreme Court of Virginia first recognized, in *Naccash v. Burger*, 223 Va. 406 (1982), that parents may sue in negligence for the "wrongful birth" of a child.  In *Naccash*, the defendant "negligently failed to discover that the fetus . . . was affected by an incurable genetic disorder, causing [the mother] to forego an abortion and carry the child to term." *Id*. at 409.  In recognizing a claim for "wrongful birth," the Virginia Supreme Court allowed the parents of the child to sue for their emotional distress, thus creating an exception to the general rule prohibiting recovery for emotional distress in the absence of physical injury. *Id*. at 415-16. "Essential to the recognition of a cause of action in favor of the [parents] is the existence of a legal duty owed *them*." *Id*. at 414 (emphasis added).  The Court held that, when the parents presented themselves for genetic testing, "they were owed the duty of reasonable care . . . this duty encompassed the obligation to provide them with reasonably accurate information concerning the condition of their unborn child so they could make an informed decision regarding abortion." *Id*.  Notably, the Court in *Naccash* spoke in the plural, *e.g.,* "parents," and "they," and "them," rather than just in terms of "the mother."

Contrary to arguments advanced by LabCorp, there is no Virginia case pertinent to the facts of this case that would limit the applicability of the decision in *Naccash*.  "Wrongful birth" claims are not limited to those cases in which a duty arises from a traditional patient-physician relationship.  Furthermore, LabCorp's argument that Mr. Zeb has no claim because he is not a "patient" under the VMMA ignores the particular facts in this case, and clear Virginia precedent

-12-

holding otherwise.

In *Didato v. Strehler*, 262 Va. 617 (2001), the defendant asserted that the physician and his corporation owed no duty of care to the plaintiffs because the plaintiffs were not "patients" under the VMMA.  To that argument, the Court responded that

> [t]he defendants' contention that they could not assume a duty to a non-patient to comply with the standard of care in [Virginia] Code §8.01-581.20 is without merit. We find no language in Code §8.01-581.20 which vitiates the common law rule that one who assumes a duty must discharge that duty with reasonable care.

*Didato*, 262 Va. at 629.

The facts of *Didato* are instructive.  The plaintiffs alleged that the defendants were negligent in failing to inform them that one of their children was born with beta O thalassemia. *Id*. at 624.  The plaintiffs contended that, had they known of the child's condition, they would not have conceived more children.  *Id*. at 624-25.  Because the defendants did not inform the plaintiffs of the child's condition, telling them instead that she was disease-free, the plaintiffs conceived another child, who was born with beta O thalassemia.  *Id*.

Like LabCorp in this case, the defendants in *Didato* argued that the plaintiffs had failed to plead sufficient facts to support a cause of action, asserting that the plaintiffs were not "patients" within the meaning of Va. Code § 8.01-581.1.  *Id*. at 620, 625.  In defendants' view, because the plaintiffs were not "patients," defendants allegedly owed them no duty.  *Id*. at 625.

The Court ultimately found that the plaintiffs pleaded sufficient facts to support a finding that they were "patients," *id*. at 626; however, the Court went even further, in a way that provides clear guidance for this case, holding that the plaintiffs also had a viable negligence claim against the defendant, *separate and apart from the patient-doctor relationship*, *id*. at 628-29.  Even if the plaintiffs were not "patients," the defendant owed them a duty of care under

-13-

common law negligence principles. *Id.* at 629. Rejecting the argument that no duty was owed to a non-patient, the Court held:

> Even if the Plaintiffs are unable to establish with evidence at trial that the standard of care required that a reasonably prudent pediatrician communicate certain information to them, the Plaintiffs pled sufficient facts which, if proven at trial, would permit the finder of fact to conclude that the Defendant assumed the duty to convey to the Plaintiffs the correct results of their daughter's test, which indicated that she carried the [sickle cell or beta O thalassemia] trait.

*Id. Didato* underscores that the "negligent undertaking" theory is well-established in Virginia:

> As the Plaintiffs correctly point out, and the Defendant do not dispute, we have cited with approval the legal principle that "[i]t is ancient learning that one who assumes a duty to act, even though gratuitously, may thereby become the subject to the duty of acting carefully, if he acts at all." *Nolde Bros. v. Wray*, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980) (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 276 (1992)); *accord Ring v. Poelman*, 240 Va. 323, 326, 397 S.E.2d 824, 826 (1990); *Cofield v. Nuckles*, 239 Va. 186, 192, 387 S.E.2d 493, 496 (1990). We also observe that this common law principle is embodied in the RESTATEMENT (SECOND) OF TORTS §323:
>
>> 'One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>>
>> (a) his failure to exercise such care increases the risk of such harm, or,
>>
>> (b) *the harm is suffered because of the other's reliance upon the undertaking*.'

*Id.* (emphasis added).

The principles embodied in *Didato* compel me to reject LabCorp's argument that it owed no duty to Mr. Zeb because he was not a "patient."[8] LabCorp undertook for consideration "to

---

[8] LabCorp makes no argument that it owed no duty to Mr. Zeb under traditional negligence principles, and it is abundantly evident that they did owe him such a duty. It has long been the law of Virginia that a duty extends to anyone who could reasonably and foreseeably be injured by one's failure to use ordinary care.

(continued...)

-14-

render services to another which [LabCorp] should recognize as necessary for the protection of the other's person or things" and Mr. Zeb has suffered and continues to suffer "harm because of [his] reliance upon the undertaking." *Id.* Like the defendant in *Didato*, LabCorp is "subject to liability to the other" for harm resulting from the "failure to exercise reasonable care to perform [the] undertaking." *Id.*

In *Didato*, the Court held that the defendant owed a duty to the parents to inform them that their child had a genetic disease. In *Naccash*, the defendant's duty ran to both parents, not just the mother (even though she alone could abort the child) and not just the father (even though he was the one who underwent the blood test). In this case, the facts establish that LabCorp owed both Ms. Khadim and Mr. Zeb a duty of care. LabCorp, for consideration, conducted a test that, like the one in *Naccash*, would permit the parents of an unborn child to make an informed decision whether to continue the pregnancy. LabCorp was charged with providing Plaintiffs with accurate information they would rely on, like the plaintiffs in *Didato*, to make a decision about family planning. LabCorp requested information from both Plaintiffs about their DNA, and both Plaintiffs supplied it, so that an accurate diagnosis could be made.

## C.

LabCorp attempts to hang its hat upon *Fruiterman v. Granata*, 276 Va. 629 (2008). At a first, cursory glance, *Fruiterman* would appear to support LabCorp's argument. However, a more considered review of *Fruiterman*, coupled with an understanding of how it relates to *Didato*, as well as how it fails to relate to the facts of the instant case, reveals that *Fruiterman*

---

[8](...continued)
*See, e.g., Hall v. Hall*, 240 Va. 360, 363 (Va. 1990); *Philip Morris v. Emerson*, 235 Va. 380 (Va. 1988); *S. States Grain Mktg. Coop. v. Garber*, 205 Va. 757, 761 (Va. 1965); *Standard Oil Co. v. Wakefield*, 102 Va. 824, 831 (Va. 1904). LabCorp can sustain no argument that it was not reasonably foreseeable that Mr. Zeb would be injured by its negligence.

actually favors the Plaintiffs here.

The allegations in *Fruiterman* were materially different from the instant case, and the outcome specifically depended on those allegations.  The plaintiffs, husband and wife, each alleged a physician-patient relationship with the defendant doctors, and that the doctors breached the standard of care.  *Id*. at 633.  The Court made clear that the holding depended upon the specific nature of the allegations:

> Joseph and Julie did not allege that the doctors breached the standard of care by failing to advise them *as a couple* about genetic counseling or to recommend *genetic screening tests* that either Joseph alone or both of them would need to undergo. Instead, they asserted that the Doctors breached the standard of care *by failing to inform Julie* about the availability of CVS during the first trimester.

*Id*. at 644 (emphasis added).  Based on *those specific allegations*, the Court held that only the wife was a patient, not the father.  *Id*. ("[W]e conclude the evidence . . . was insufficient to show a 'consensual transaction giving rise to a physician-patient relationship and a duty to perform the service contemplated.'") (citations omitted).

However, the matter did not end there.  The father argued that, in the absence of a traditional physician-patient relationship, he nevertheless had a claim against the doctors under *Didato*.  The Court expressly acknowledged that, "[a]s we recognized in *Didato*, a physician can, in certain circumstances, affirmatively undertake to provide health care to an individual, who prior to that moment was not the physician's patient, and thereby assume the duty to comply with the applicable standard of care."  *Id*. at 645.  However, until *Fruiterman*, the Court had never had the opportunity to pass upon what facts would be required to maintain such a claim. Given the specific facts of the case, the Court ultimately found the husband's facts insufficient to establish a claim under *Didato*.  The reasoning in *Fruiterman*, however, *supports* the existence of a claim under the facts of the instant case.

-16-

In *Fruiterman*, the Court affirmed the *Didato* holding that a plaintiff who is not a "patient" may still assert a claim under the principle that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Id.* (citing *Didato*, 262 Va. at 268). The Court stated that evidence that the defendant "'personally engage[d] in some affirmative act amounting to a render[ing of] services to another'" would establish a claim under *Didato*. *Id.* at 646 (quoting *Jenkins v. Best*, 250 S.W.3d 680, 693 (Ky. Ct. App. 2007)). Such is the case here: LabCorp affirmatively engaged in requesting and analyzing Mr. Zeb's genetic material as part of its testing and used that information to inform (or misinform) the couple that their child did not have the disease. The Court indicated that the presence of consideration was relevant to a claim under *Didato*. *Id.* (citing *Stanley v. McCarver*, 92 P.3d 849, 853 (Ariz 2004)). Again, such is the case here: LabCorp explicitly markets its services to couples, not just mothers. Finally, the Court indicated that "the actor must specifically have undertaken to perform the task that he is charged with having performed negligently." *Id.* (quoting *Dekens v. Underwriters Laboratories Inc.*, 132 Cal. Rptr. 2d 699, 702 (Cal. Ct. App. 2003)). And again, such is the case here: LabCorp specifically undertook to perform the testing that Plaintiffs contend was done negligently, knowing full well that a father – Mr. Zeb – could rely upon and be affected by the results.

*Fruiterman* simply does not apply to the facts of the instant case. The plaintiffs in *Fruiterman* alleged negligence arising from defendant doctors' failure "to provide Julie [Granata] information about first trimester testing," *i.e.*, genetic *counseling*, "which would have revealed that the couple's twin fetuses were afflicted with Down syndrome." *Id*. at 633. But the instant case is not at all about wrongful birth resulting from genetic *counseling*; rather, the instant case arises from a wrongful birth because of LabCorp's negligence in performing genetic

-17-

*testing.*[9]  LabCorp owed a duty of care to Mr. Zeb under traditional negligence principles, and

therefore he is a proper plaintiff in this case in his own right.[10]


## IV.

### A.

In its Answer, LabCorp asserted, as its eighth affirmative defense, that "LabCorp is a

'health care provider,' and, as such, is entitled to the protection of the Virginia Medical

Malpractive Act, Va. Code Ann. § 8.01-581, *et seq.*"

Plaintiffs moved for partial summary judgment, arguing that

> LabCorp will claim that it falls under the definition of "health care provider" set
> forth in § 8.01-581.1 because it acted as an independent contractor of Plaintiffs'
> physicians.  However, the plain language of the statute, as applied to the undisputed
> facts of this case, disproves LabCorp's position because LabCorp was <u>never</u>

---

[9] LabCorp contends that it did not have a duty to Mr. Zeb because there was no doctor-patient relationship between it and Mr. Zeb.  But by those lights, it did not even have a duty to Ms. Khadim: LabCorp provided its services to Genzyme, which provided the results to Dr. Head, who provided the results to Ms. Khadim. Of course, subsequently, LabCorp received genetic samples from *both* parents, a fact that further undermines LabCorp's position, given that LabCorp undisputedly misread its results from the genetic material Mr. Zeb affirmatively supplied, and LabCorp undisputedly knew that this genetic material was obtained from the father of the then-unborn child.  In any event, regardless of whether LabCorp knew or did not even suspect that there was a Mr. Zeb who was relying on it to fulfill its duty, LabCorp had a duty to exercise "reasonable care" in the performance of its "undertaking."  *Didato v. Strehler*, 262 Va. 617, 629 (2001).

Under the facts of this case, there is no statute and no precedent requiring Plaintiffs to plead and prove the existence of a physician-patient relationship with LabCorp in order to pursue a wrongful birth claim under Virginia law.  Regarding LabCorp's contention that it owes Mr. Zeb a duty only if he was a "patient" under the VMMA, the VMMA does not create a unique claim against a physician by a patient.  Rather, the VMMA identifies a subset of negligence cases where the VMMA, including its limitation on damages, applies.  *See, e.g., Etheridge v. Medical Center Hospitals*, 237 Va. 87, 96 (1989) (observing that the limitation on medical malpractice recoveries contained in the VMMA does "nothing more that establish the outer limits of a remedy").

[10] I note that this failure to meet the duty of care under traditional negligence principles is "malpractice" as defined in Va. Code § 8.01-581.1: "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient."

<u>engaged</u> by Plaintiffs' physicians and, thus, is not entitled to the protections of the Act.

Soon thereafter, LabCorp also moved for partial summary judgment, contending that it is a "health care provider."   Citing to the Declaration of Dr. Kenneth Friedman, "the Technical Director of Molecular Genetics for [LabCorp] at the Center for Molecular Biology and Pathology," located in Research Triangle Park, North Carolina, LabCorp states that its "testing laboratories are certified pursuant to the Clinical Laboratory Improvement Amendments of 1988 ('CLIA') by the Secretary of the Department of Health and Human Services," that its "primary business purpose is to provide clinical laboratory services to the medical community and to individual patients seeking clinical laboratory testing from a CLIA certified clinical laboratory," and that, "[i]n its testing laboratories, LabCorp employs or independently contracts with physicians that are licensed to practice in the states in which they are employed."   LabCorp adds that

> [t]he Director of the Molecular Genetics laboratory that performed the subject testing for Ms. Khadim was Dr. Kenneth Friedman.   Dr. Friedman has a doctorate in genetics and is board-certified in clinical molecular genetics by the American Board of Molecular Genetics.   The Molecular Genetics laboratory is inspected and evaluated for compliance by the College of American Pathologists and/or the New York State Department of Health.   The laboratory testing facilities that comprise the Center for Molecular Biology and Pathology are overseen by eighteen Ph.D. level scientists, as well as eleven pathologists who are licensed in twenty-three states, including the state of Virginia.

(Citations to the Declaration of Dr. Kenneth Friedman omitted.)   Dr. Friedman's Declaration states that "the Centers for Medicare and Medicaid Services (CMS), which is responsible for overseeing compliance with CLIA requirements," and "[t]he College of American Pathologists ('CAP'), . . . a national accreditation organization for CLIA," have "inspected and evaluated" Labcorp's "testing laboratories . . . as being in compliance with CLIA by CAP and/or the local

CMS office."  Dr. Friedman further declares that LabCorp's "two adjacent facilities" located in Research Triangle Park "are overseen by 18 Ph.D. level scientists and 11 licensed pathologists. The pathologists are licensed in 23 states including the state of Virginia (Drs. Lixia Liu and Leena Lourduraj)."

> The VMMA defines "health care provider" as follows, in part:
>
> (i) a person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services . . . (ii) a professional corporation, all of whose shareholders or members are so licensed; (iii) a partnership, all of whose partners are so licensed . . . (vi) a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a licensed health care provider and which primarily renders health care services; or (vii) a director, officer, employee, independent contractor, or agent of the persons or entities referenced herein, acting within the course and scope of his employment or engagement as related to health care or professional services.

Va. Code § 8.01-581.1, "Definitions."  The statute also provides that "'*Health care*' means any act . . . or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement."  *Id*.

LabCorp contends that, "[a]pplying this language," it "provided 'health care' to Ms. Khadim by virtue of performing or failing to perform an act during her medical diagnosis," and that it "was a 'health care provider,' as LabCorp is a corporation which employs a licensed health care provider, primarily renders health care services, and/or also serves as an independent contractor to physicians who provide health care services."

LabCorp observes that the VMMA defines "malpractice" as "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Va. Code § 8.01-581.1.  LabCorp argues that, because Plaintiffs "would not have suffered [their

alleged] emotional distress had LabCorp not made a misdiagnosis, Plaintiffs have brought a tort action for personal injuries based on LabCorp's health care services to a patient."

**B.**

Plaintiffs then moved to strike certain elements of Dr. Friedman's Declaration.  Plaintiffs contend that, in arguing that it qualifies as a "health care provider" as defined by Va. Code § 8.01-581.1, LabCorp relies entirely upon the Declaration, but that such reliance is improper because (1) Dr. Friedman's assertions are based on inadmissible hearsay, (2) Dr. Friedman was never disclosed as being knowledgeable on the matters upon which he declares, and (3) the facts asserted by Dr. Friedman were never disclosed to Plaintiffs in discovery.

**1.**

Rule 56(c)(2) of the Federal Rules of Civil Procedure provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Summary judgment affidavits cannot be conclusory, or based upon hearsay.  *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citations omitted).

Plaintiffs contend that Dr. Friedman, "in his Declaration, purports to be testifying based on his own personal knowledge," and that, "[a]s it relates to whether the medical malpractice cap applies," he "declares upon a broad range of topics and his assertions are either conclusory or only could have been obtained through a secondhand source."  By their own description, Plaintiffs provide "only two examples of the many assertions that Dr. Friedman makes that are either conclusory or that can only be based on hearsay."  Plaintiffs maintain that Dr. Friedman

"would not be a permissible witness to testify on these matters and his Declaration should not be considered on any subject upon which his testimony only states conclusions or is based on hearsay."

The first example to which Plaintiffs specifically object is Dr. Friedman's assertion that "LabCorp employs or independently contracts with laboratory directors, including pathologist Medical Directors, in the testing laboratories that LabCorp operated."  Plaintiffs argue that he "does not assert that any of the Medical Directors or laboratories" to which he refers "are located in Virginia," and that he "does not reference or cite to any contracts in support of this statement, nor does he state that he has reviewed or has any direct knowledge of any agreements."

The second example to which Plaintiffs specifically object is Dr. Friedman's assertion that two of LabCorp's pathologists at the facilities in Research Triangle Park "are licensed in 23 states including the state of Virginia. . . ."  Plaintiffs contend that "Dr. Friedman does not state that these two pathologists are employees of either or both of the two LabCorp Defendants," and that "[t]he only possible way that Dr. Friedman knows in which states these pathologists are licensed is hearsay."

Plaintiffs' objection is without merit.  The record indicates that Dr. Friedman has been LabCorp's Technical Director of Molecular Genetics since 2003.  He has personal knowledge of the facts asserted in his declaration.  He undoubtedly knows whether "LabCorp employs or independently contracts with laboratory directors, including pathologist Medical Directors, in the testing laboratories that LabCorp operated," and as for the argument that he "does not assert that any of the Medical Directors or laboratories" to which he refers "are located in Virginia," it does

not appear to matter whether they "are located in Virginia."[11]  As for his failure to "reference or cite to any contracts in support of this statement, nor does he state that he has reviewed or has any direct knowledge of any agreements," again, such reference is unnecessary, as his personal knowledge is, at this stage, sound, given that his Declaration "set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated," in accordance with Rule 56(c)(4).

**2.**

Federal Rule of Civil Procedure 26(a)(1) requires a party to identify "the name . . . of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses," as well as any documents that it seeks to use to support its defenses.  Fed. R. Civ. P. 26(a)(1)(A)(i), (ii).  As with all discovery obligations, this obligation is ongoing.  Parties reasonably rely upon these disclosures to shape their pretrial discovery strategy and in knowing what subjects to ask about during a witness's deposition.

In LabCorp's Answer to Plaintiffs' Complaint, it asserted the medical malpractice cap as its Eighth and Ninth Affirmative Defenses.  Plaintiffs contend that, "by at least that date, LabCorp knew that the cap would be an issue and, presumably, had conducted some sort of investigation upon which it based these defenses," but that, in its Rule 26(a)(1) disclosures, LabCorp "did not disclose any witness or any document regarding the application of the cap."  To be sure, LabCorp disclosed Dr. Friedman as a person with knowledge, but only "of

---

[11] As discussed elsewhere in this opinion, the record shows that LabCorp employs or independently contracts with pathologists at its Research Triangle Park facilities who (i) are licensed in Virginia, and (ii) were licensed in Virginia and employed by LabCorp in Research Triangle Park during the time relevant to this case.

Beta-Thalassemia testing performed for Plaintiffs and the LabCorp Defendants' interactions with physicians regarding Plaintiffs' test results."  To the extent LabCorp disclosed Dr. Friedman as a liability expert, nothing in the disclosure concerns whether the cap applies to this case.  LabCorp never supplemented these disclosures to notify Plaintiffs that Dr. Friedman would testify on matters relevant to the application of the cap.

Thus, Plaintiffs contend, when they deposed Dr. Friedman, "they had no reason to probe the basis of his knowledge of [LabCorp's] licensing and business authorizations or the various states of licensure of [LabCorp's] pathologists," and "[i]t was not until Plaintiffs received [LabCorp's] motion for summary judgment that they had any idea that [LabCorp] would be relying solely upon Dr. Friedman to gain the protection of the cap."  In Plaintiffs' view, they were not given the opportunity to conduct discovery on the alleged facts contained in portions of Dr. Friedman's Declaration, including "whether any of the entities referenced in" the Declaration "are located in Virginia."  Similarly, they contend that they "were unable to discover whether the pathologists referenced in" the Declaration "were employed by either or both of the LabCorp Defendants."  Plaintiffs maintain that "§ 8.01-581.1 contains very precise and specific requirements in order for a defendant to gain the umbrella of the medical malpractice cap," and that they "have a right to closely examine any facts that [LabCorp] allege[s] to avail [it] of the statute's protection."

Plaintiffs' claim of surprise by the substance of Dr. Friedman's declaration is not founded, and the motion to strike on this ground will be denied.  This case arises out of laboratory work performed by pathologists, *i.e.*, doctors.  The claim that this is a special fact that must be especially proved is not well-taken.  It is a fact that has always been disclosed in this case, and it is apparent from the document production, deposition testimony, and public information always

-24-

available to Plaintiffs.[12]  *See*, *e.g.*, *Nucor Corp. v. Bell*, Civil Action No. 2:06-CV-02972, 2008 WL 4442571, at *16 (D.S.C. Jan. 11, 2008) ("there is little surprise or harm where . . . the supporting information could be found in publically-accessible sources").  LabCorp's employment of physicians and the broad variety of health care services it offers was disclosed during the early stages of discovery.  *See* Fed. R. Civ. P. 26(e)(1) (stating that a party has a duty to supplement only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process").

Significantly, the depositions taken by Plaintiffs revealed that LabCorp employs medical doctors and is engaged with Virginia-based medical providers.  Although LabCorp did not formally supplement its written discovery responses to state that Dr. Friedman had "knowledge as to the fact that LabCorp employs and engages licensed physicians," Dr. Friedman, his title, and his participation in Plaintiffs' testing and the diagnosis of their unborn child were disclosed. To the extent that not saying more in the Rule 26 disclosure about Dr. Friedman's knowledge could be deemed a failure to disclose, any such failure was "substantially justified" or "harmless" because, simply put, it is no secret that LabCorp retains doctors.  *See Southern States Rack and Fixture v. Sherwin–Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003) ("[T]he basic purpose of Rule 37(c)(1) [is] preventing surprise and prejudice to the opposing party").[13]  I fail to

---

[12] There is no legitimate dispute as to whether Plaintiffs have had access to public information about LabCorp, given that they cite LabCorp's Web-site in their motion for partial summary judgment.

[13] Rule 37(c)(1) states, in pertinent part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  *See also* Fed. R. Civ. P. 26(e) advisory committee's note, 1993 Amendments ("[t]here is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition. . . ."

see how Plaintiffs can claim to be surprised by the fact that a national clinical testing laboratory that publicly identifies itself as employing dozens of physicians actually employs dozens of physicians.  As for documentation regarding Drs. Liu and Jourduraj licensure in Virginia, the challenged assertions have now been properly supported, in accordance with Rule 56(e)(1),[14] by LabCorp's subsequent submissions.  *See* www.vahealthprovider.com/search.asp (Va. Board of Medicine Web-site); *see also* docket no. 43, attachment no. 9, "LabCorp Virginia Physicians Schedule."

**3.**

Plaintiffs contend that, "[j]ust as Dr. Friedman's supposed knowledge of facts relevant to whether the cap applies was never disclosed to Plaintiffs, none of the material facts contained in his Declaration were ever disclosed to Plaintiffs in discovery despite [LabCorp's] obligation to do so."  Plaintiffs state that, in discovery, they lodged the following specific inquiry about the bases of LabCorp's defenses: "For each of the defenses asserted by you in your Answer to the Complaint, identify each fact, document, and/or person that you will rely upon for such defense. For each person identified, summarize that person's knowledge as it relates to each defense." Thus, Plaintiffs contend, they "clearly requested the information that Dr. Friedman now asserts and that [LabCorp] now rel[ies] upon in support of [its] request to apply the cap," but LabCorp "never provided Plaintiffs with any of this information," but instead "objected to the interrogatory" as follows:

> LabCorp objects to this interrogatory as it prematurely requests information when discovery has just begun and plaintiffs have not provided any discovery responses at

---

[14]  Rule 56(e)(1) states, in pertinent part:  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact. . . ."

this point and time.  LabCorp further objects to this interrogatory as it improperly
calls for information subject to the attorney work product doctrine and trial strategy.

Plaintiffs contend that such "objections may be well-taken for material that is actually
work product or that contains trial strategy, but it does not apply to the factual material allegedly
supporting [LabCorp's] claim that the medical malpractice cap applies," and that, "if only part of
an interrogatory is objectionable, the responding party must answer the interrogatory to the
extent that it is not objectionable."  Citing Fed. R. Civ. P. 33(b)(1); *Tequila Centinela, S.A. de
C.V. V. Bacardi & Company Limited*, 242 F.R.D. 1 (D.D.C. 2007).

In Plaintiffs' view, LabCorp "lodged this objection well after" filing its Answer asserting
that it was a "health care provider" under Virginia Code § 8.01-581.1, LabCorp "could not have
asserted this defense without a good-faith basis to do so," and "the notion that they could not
respond to this Interrogatory because it was too early is not valid."  Plaintiffs add that "the facts
that a party will use as basis for its claims or defenses are, by definition, not protected by the
work product doctrine," given that, "[i]f a party wants to introduce facts at trial, it may not claim
work product privilege over those facts."

This argument for striking the Declaration also fails.  Dr. Friedman, as I have already
explained, is a person with "personal knowledge" who "set[s] out facts that would be admissible
in evidence" and "is competent to testify on the matters stated," in accordance with Rule
56(c)(4).  It was clear that, "[f]or each of the defenses asserted by [LabCorp] in [its] Answer to
the Complaint," Dr. Friedman has now been identified as a person upon whom LabCorp would
rely, and the Declaration "summarize[d] [his] knowledge as it relates to" the VMMA defense.
And, significantly, even though the objection to the interrogatory is arguably unfounded, it is
"harmless," *see* Rule 37(c)(1), given that the record reflects that, until LabCorp filed its motion

-27-

for partial summary judgment and Plaintiffs received Dr. Friedman's declaration, Plaintiffs planned to depose Dr. Friedman a second time as LabCorp's corporate designee.

On September 9, 2011, the parties jointly filed and on September 16, 2011, this court entered a Consent Order allowing this and other depositions after the close of regular discovery. *See* Doc. No. 28, Amended Pretrial Order.  On September 22, 2011, and 26, 2011, LabCorp advised Plaintiffs that Dr. Friedman was available for deposition during the weeks of October 3 and October 17.  However, after receiving Dr. Friedman's declaration with LabCorp's motion for partial summary judgment, Plaintiffs then called off the agreed-upon deposition and proceeded to file the motion to strike, arguing prejudice on the ground that they were unable to depose Dr. Friedman on the "health care provider" facts in his declaration.

This led to an exchange of e-mails between LabCorp's and Plaintiffs' counsel.  LabCorp's counsel encouraged Plaintiffs to depose Dr. Friedman about anything contained in the declaration in addition to the issues outlined in Plaintiffs' 30(b)(6) notice, but Plaintiffs' counsel failed to commit and ultimately declined to do depose Dr. Friedman a second time.  By e-mail on October 3, Plaintiffs' counsel said he was not available to depose Dr. Friedman, explaining, "I'm confident Dr. Friedman would regurgitate what is in the declaration," and added that "[t]he information we need is the names of the people through whom you believe the cap applies, their licensing information, and documentation that they were employed by both LabCorp entities at the time of the incident, and in what capacity."   As explained in the preceding section of this opinion, that information has been supplied; indeed, the record indicates that, during the time when LabCorp's counsel was sending more e-mails encouraging Plaintiffs' counsel to re-depose Dr. Friedman (and Plaintiffs' counsel continued to refuse the opportunity, claiming to have been disadvantaged by the delay, but refusing the opportunity to cure the problem), LabCorp's

-28-

counsel provided, on October 5, 2011, a schedule listing its physicians, including its Virginia-licensed physicians, and their employment status and other data.  *See* docket no. 43, attachment no. 9, "LabCorp Virginia Physicians Schedule."

The record further indicates that LabCorp then proposed that the parties schedule the summary judgment hearing on October 20 or 21, 2011, rather than on October 13, 2011, to enable Plaintiffs to depose Dr. Friedman during the week originally set aside for his corporate designee deposition.  After jointly setting the dispositive motions hearing for October 21, 2011, LabCorp once again offered to produce Dr. Friedman on October 17, 2011, in order to alleviate any concerns expressed in Plaintiffs' motion to strike prior to the hearing.  LabCorp further offered to consent to extend the response date for Plaintiffs' opposition to LabCorp's motion for partial summary judgment to October 18 or 19, 2011, in order to allow Plaintiffs to conduct the additional discovery that they deemed necessary.  And, while complaining that they had been denied the opportunity to discover facts about LabCorp's health care provider status, Plaintiffs simultaneously declined to take advantage of the opportunity to discover such facts, and confirmed their earlier cancellation of the previously scheduled deposition of Dr. Friedman as a corporate designee.  Plaintiffs' sole response to LabCorp's repeated overtures was to state that deposing Dr. Friedman as a corporate designee "is not enough" because additional documentation or depositions would be required.  Yet, Plaintiffs did not (and do not) specify what information they wished to receive that could not have been timely discovered.

I will not strike the Declaration, given that, if Plaintiffs were "surprised here, that surprise was minimal and largely curable."  *See Carotek, Inc. v. Textron Fastening Sys., Inc.*, Civil Action No. 3:05-CV-395, 2008 WL 1777829, at *3 (W.D.N.C. Apr. 16, 2008) (declining to strike evidence).  Although Plaintiffs' counsel complains that the tardy indication of Dr.

Friedman's knowledge about LabCorp's employment and engagement of licensed physicians contained in Dr. Friedman's Declaration has denied them some document discovery opportunities, or that they would have taken different or additional depositions, Plaintiffs' failure to take advantage of the multiple opportunities offered by LabCorp to allow them to re-depose Dr. Friedman (and confirm what they already knew) and proceed from there undercuts any assertion that Plaintiffs required additional information to respond to LabCorp's motion for partial summary judgment.

## C.

The record shows that LabCorp is a health care provider under subsection (vi) of the VMMA, which includes any corporation such as LabCorp that employs or engages licensed health care providers and primarily renders health care services. LabCorp also qualifies as a health care provider under subsection (vii), as an independent contractor of the physician who provided the genetic counseling services that relied upon the genetic testing performed on Plaintiffs by LabCorp.

## 1.

Ms. Khadim's obstetrician, Dr. Barbara Head, performed an amniocentesis procedure on Ms. Khadim at the Women's Pavilion at the Henrico Doctor's Hospital in Richmond, in order to have the fetus tested for the beta thalassemia trait. The amniotic fluid sample was initially sent to Genzyme Genetics ("Genzyme") for a routine fetal karyotype and amniotic fluid alpha-fetoprotein evaluation. No specific genetic concern prompted the chromosome study; Dr. Head testified that a karyotype analysis routinely accompanied every amniocentesis. After performing the chromosome evaluation, Genzyme sent cultured cells from the amniotic sample to LabCorp to perform the beta thalassemia testing requested by Dr. Head.

LabCorp received the fetal sample, conducted the beta thalassemia testing, and initially reported, on March 30, 2009, that the fetus appeared to be an unaffected carrier of the beta-thalassemia mutation.   After LabCorp issued this report, a LabCorp genetic counselor, Dagny Patton, called Dr. Head's office to convey the results, and gave a "full verbal" report to a nurse identified as "Jennifer H.," or Jennifer Hall.   Ms. Patton advised Jennifer that, unless LabCorp received confirmation of the parents' specific genetic mutations, LabCorp could not ascertain whether the test panel covered these mutations.   Ms. Patton discussed available options, including "counseling [patient] based on these results and info that is known, drawing mom and dad for beta-thal DNA, and sending prenatal specimen out for beta-thal sequencing." Jennifer requested that Ms. Patton fax the results directly to Dr. Head's office, and provided a fax number.

On April 1, 2009, another nurse in Dr. Head's office, Glenda Stephen, contacted Ms. Patton to inform her that they would have the parents tested in accordance with Ms. Patton's recommendation.   Ms. Stephen directly contacted LabCorp again on April 24, 2009, to convey the results of the parents' genetic testing, and stated that she would fax a copy of the results to LabCorp's supervisor of genetic services, Edward Williams.    After LabCorp reviewed this additional information, Mr. Williams in turn faxed a "corrected" laboratory report to Ms. Stephen at Dr. Head's office that same day.   In total, LabCorp released three reports in connection with the prenatal genetic testing performed on Ms. Khadim's amniotic sample.  All three of the reports are addressed to the Women's Pavilion in Richmond.  LabCorp likewise sent an invoice to the Women's Pavilion, which billed the patient's insurance for LabCorp's medical services as well as Dr. Head's.

-31-

**2.**

Those portions of the record discussed in the section of this opinion regarding Plaintiffs' motion to strike indicate that LabCorp falls squarely within the plain language of Va. Code § 8.01-581.1(vi), which defines a health care provider as "a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a licensed health care provider and which primarily renders health care services."  To qualify as a "health care provider" under Va. Code § 8.01- 581.1(vi), an entity must therefore (a) be a corporation or other entity, (b) which employs or engages a licensed health care provider, and (c) which primarily renders health care services.  LabCorp chiefly provides health care services to assure that patients receive proper medical testing and diagnoses.[15]  In addition, LabCorp is a corporation that employs and engages, as independent contractors, pathologists and other medical doctors licensed in Virginia.

**3.**

LabCorp also qualifies as a "health care provider" under the VMMA under Va. Code § 8.01-581.1(vii), which includes "a director, officer, employee, *independent contractor*, or agent of the persons or entities referenced herein, acting within the course and scope of his employment or engagement as related to health care or professional services."  (Emphasis added.)  LabCorp functioned as an independent contractor to  Dr. Head.[16]

---

[15] A persuasive fact in favor of finding that Mr. Zeb is a proper plaintiff in his own right is that LabCorp actually reviewed genetic tests performed on Mr. Zeb when making his "corrected" report.  Thus, LabCorp, a "health care provider," provided "health care services" to Mr. Zeb separate and apart from those "health care services" provided to Ms. Khadim through her obstetrician.

[16] Plaintiffs devote much ink to *Richman v. National Health Care Laboratories, Inc.*, 235 Va. 353 (1988), a case that interprets the VMMA as it existed *before* the General Assembly amended the statute to include the provisions in sub-sections (vi) and (vii), upon which LabCorp relies.

The well-established common-law definition of independent contractor is "a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results." *Ogunde v. Prison Health Services, Inc.*, 274 Va. 55, 60 (2007); *Atkinson v. Sachno*, 261 Va. 278, 284 (2001) (citing *Epperson v. De Jarnette*, 164 Va. 482, 486 (1935)); *see also Creative Designs Tattooing Assoc., Inc. v. Parrish*, 56 Va. App. 299, 308 (2010) (citing *Davis Bakery v. Dozier*, 139 Va. 628, 634 (1924)) ("An independent contractor 'prosecutes and directs the work himself, using his own methods to accomplish it.'"); *Southern Floors and Acoustics, Inc. v. Max-Yeboah*, 267 Va. 682, 687 (2004) (citing *Craig v. Doyle*, 179 Va. 526, 531 (1942)) ("An independent contractor is one who undertakes to produce a given result without being in any way controlled as to the method by which he attains that result.").

The services rendered by LabCorp fit squarely within this definition. The record more than adequately reflects that LabCorp was "employed to do a piece of work without restriction as to the means to be employed," with Dr. Head's office (or even Genzyme[17]) "look[ing] only for

---

[17] As for Plaintiffs' argument that Genzyme engaged LabCorp as a "subcontractor," and LabCorp is thus excluded from the VMMA's definition of "health care provider" because it is a "subcontractor," not an "independent contractor," that argument fails. The classification of "subcontractor" does not convey its own distinct legal status separate from that of either an independent contractor or an agent/employee; indeed, a subcontractor necessarily falls into one of these two well-established common law categories. One can be a subcontractor and an agent of the principal or one can be a subcontractor and an independent contractor of the principal. *See Southern Floors and Acoustics, Inc. v. Max-Yeboah*, 267 Va. 682, 689 (2004) (holding that "Southern Floors was an independent contractor" when "Southern Floors was a subcontractor of a general contractor with whom Food Lion had contracted for store renovations."). It is well-established that the right to assign an employment contract without the consent of the other contracting party is a right inherent in the status of an independent contractor such as Genzyme. *See Stith v. Thorne*, 488 F. Supp. 2d 534, 550 (E.D. Va. 2007); *Texas v. Zeigler*, 177 Va. 557, 566 (1941). Thus, even accepting as true Plaintiffs' contention that LabCorp served as a subcontractor to Genzyme, this would not strip LabCorp of its legal status as an "independent contractor" for purposes of the VMMA's definition of "health care provider."

results." *Ogunde*, 274 Va. at 60 (2007).  As such, LabCorp was an "independent contractor," and thus further qualifies as a "health care provider" under Va. Code § 8.01-581.1(vii).

## V.

For the stated reasons, I find that Sultan Zeb is a proper plaintiff, and I will deny Defendant's motion for partial summary judgment (docket no. 36), in part, on that ground. Regarding the limitation of damages under the VMMA, I find that LabCorp is a "health care provider" for purposes of the VMMA, and thus the VMMA's limitation on damages does indeed apply here; accordingly, I will grant Defendant's motion for partial summary judgment (docket no. 36), in part, on that ground, and I will deny Plaintiff's motion for partial summary judgment (docket no. 32), which seeks partial summary judgment that the VMMA's cap on damages does not apply.  And, for the stated reasons, Plaintiffs' motion to strike (docket no. 39) will be denied.

An appropriate order accompanies this memorandum opinion.

Entered this ____7th____ day of November, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

-34-